**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    Plaintiff,<br><br>v.<br><br>**TYREECE F. GRAY (01),**<br><br>    Defendant. | Case No. 11-20131-01-DDC |

**MEMORANDUM AND ORDER**

This matter comes before the court on prisoner Tyreece Gray's Motion for Compassionate Release (Doc. 119). Mr. Gray seeks compassionate release because of the COVID-19 pandemic. *Id.* at 1. The Federal Public Defender's Office has filed a Supplement to Mr. Gray's pro se motion (Doc. 124). The government has responded (Doc. 126), and the Federal Public Defender's Office has filed a Reply (Doc. 131). For reasons explained below, the court denies Mr. Gray's motion.

**I.    Background**

In January 2012, a grand jury returned a five count Superseding Indictment against Mr. Gray. Doc. 11. The Superseding Indictment charged Mr. Gray with conspiring to maintain a drug-involved premises, distributing marijuana, possessing marijuana with intent to distribute, possessing a firearm as a prohibited person, and maintaining a place used for storage, distribution, and use of marijuana. *Id.* at 1–3. These charges, if proved beyond a reasonable doubt, would violate 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), 846, 856(a)(1), 856(a)(2), and 18 U.S.C. §§ 922(g)(1), 924(c), and 2. *Id.* In March 2013, Mr. Gray entered a plea agreement with the government. Docs. 51 & 52. He pleaded guilty to two counts of the Superseding Indictment:

(1) Count 1's conspiracy to maintain a drug-involved premises and distribution of marijuana and possession with intent to distribute marijuana, and (2) Count 3's possession of a firearm in furtherance of a drug-trafficking crime. Doc. 52 at 1. The Presentence Investigation Report ("PSR") calculated a total offense level of 14 and a criminal history category of III, producing a Guidelines sentencing range of 21 to 27 months' imprisonment. Doc. 60 at 23 (PSR ¶ 105). But, because defendant qualified as a career offender, the PSR increased his criminal history category to VI, and adjusted his Guidelines range to 97 to 106 months' imprisonment. *Id.* Then, because Mr. Gray sustained a conviction under 18 U.S.C. § 924(c), the PSR adjusted his Guidelines range to 262 to 327 months' imprisonment. *Id.* In June 2013, Judge Carlos Murguia sentenced Mr. Gray to two consecutive 60-month sentences—a total of 120 months' imprisonment—followed by five years of supervised release. Doc. 66 at 1–2 (Judgment).

Mr. Gray asserts he currently is incarcerated at FCI Forrest City Low, which has had one of the worst COVID-19 outbreaks among BOP facilities. Doc. 124 at 1. He asserts that he has served 103 months—about 90%—of his custody sentence. *Id.* He also asserts he has several medical conditions that place his health at serious risk should he contract the COVID-19 virus. *Id.* Mr. Gray proposes that the court grant him compassionate release, with the requirement that he serve one year in home confinement as a condition of supervised release. *Id.* at 1–2. After that year of home confinement, Mr. Gray asserts, he would begin his term of supervised release. *Id.* at 2.

**II.    Legal Standard**

Binding authority from our Circuit establishes that "'[a] district court is authorized to modify a [d]efendant's sentence only in specified instances where Congress has expressly granted the court jurisdiction to do so.'" *United States v. White*, 765 F.3d 1240, 1244 (10th Cir.

2014) (quoting *United States v. Blackwell*, 81 F.3d 945, 947 (10th Cir. 1996)).  Title 18 U.S.C. § 3582(c)—commonly called the compassionate release statute—permits a court to modify a term of imprisonment but only if certain exceptions apply.  For many years, these exceptions only permitted the Bureau of Prisons ("BOP") to bring a motion under the compassionate release statute.  But in 2018, the First Step Act modified the compassionate release statute and authorized a defendant to file his own motion for relief.  First Step Act of 2018, Pub. L. No. 115-391, § A 603(b)(1), 132 Stat. 5194, 5239 (2018).  This amendment authorized an inmate to make such a motion, but only after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ."  18 U.S.C. § 3582(c)(1)(A).

Mr. Gray asked his warden for compassionate release on April 10, 2020.  Doc. 119-1 at 3.  He reports that he never received a response from the warden.  Doc. 119 at 1; Doc. 124 at 2.  He asserts that because more than 30 days have lapsed since his request to the warden, he has exhausted his administrative remedies.  Doc. 124 at 2.  The government does not contend that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional.  Instead, the government acknowledges that it is a claim-processing rule.  Doc. 126 at 2.  The government concedes that Mr. Gray has "exhausted his administrative remedies concerning the medical risk factors of hypertension and hypothyroidism."  Doc. 126 at 4.  But, the government asserts, Mr. Gray has failed to exhaust his administrative remedies for "his claim . . . that obesity should be a factor in considering his release" because he never mentioned obesity in his request to the warden.  *Id.*

The court agrees that § 3582(c)(1)(A) is a claim processing rule.  In *United States v. Alam*, 960 F.3d 831 (6th Cir. 2020), the Sixth Circuit treated § 3582(c)(1)(A)'s exhaustion

requirement as a claim-processing rule, not a jurisdictional bar. *Id.* at 832–34. Although claim-processing rules don't implicate the court's subject matter jurisdiction, the court must enforce them when properly invoked. *Id.* at 833. But, if not invoked, claim-processing rules are subject to waiver and forfeiture. *Id.* at 834; *see also United States v. Spaulding*, 802 F.3d 1110, 1130–34 (10th Cir. 2015) (Gorsuch, J., dissenting) (explaining why "§ 3582(c) doesn't strip the district court of any of its preexisting post-judgment jurisdiction and is instead and again a claim-processing rule").

The Tenth Circuit hasn't yet decided whether § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional. So, the court must predict how our Circuit would decide the question. The court finds the Sixth Circuit's decision highly persuasive and the court predicts the Tenth Circuit would adopt its reasoning. Consistent with *Alam*, the court treats § 3582(c)(1)(A)'s exhaustion requirement as a claim-processing rule.

But the court disagrees with the government's argument that Mr. Gray failed to exhaust his administrative remedies for his obesity condition. That is, Mr. Gray's omission of this health condition in his request to the warden does not preclude the court from considering that condition when deciding his motion. Judge Lungstrum rejected the same argument the government makes here—*i.e.*, that inmates may not invoke medical conditions that one omitted from their request to the warden—in *United States v. Rucker*. Mem. & Order at 2–3, *United States v. Rucker*, No. 04-20150-JWL (D. Kan. July 30, 2020), ECF No. 108. Judge Lungstrum concluded that although defendant had omitted a particular medical condition in his request to the warden, he satisfied the exhaustion requirement where he had asserted that he "suffer[ed] from 'a set of medical conditions,' including two particular conditions, that ma[d]e him especially vulnerable to harm from the coronavirus." *Id.* Judge Lungstrum reasoned that "[t]he

warden had access to defendant's medical records, and defendant relied generally on his medical condition in making his request." *Id.* The court agrees with Judge Lungstrum's conclusion. Even though Mr. Gray did not specifically mention obesity in his compassionate release request to the warden, his request referenced COVID-19 and two other medical conditions. And, the warden had access to Mr. Gray's medical records when considering his request. The court thus concludes that Mr. Gray's omission does not preclude the court from considering obesity as a factor when deciding his motion.

Because Mr. Gray waited more than 30 days after asking his warden to file a motion in federal court, he has satisfied the exhaustion requirement of § 3582(c)(1)(A). And, even if he hasn't, the government has waived any objections—other than the obesity objection—to the exhaustion requirement. And the court has explained why the government's argument on that front is unpersuasive. So, the court now turns to the substance of Mr. Gray's motion.

### III. Discussion

#### A. The court exercises its discretion when deciding whether "extraordinary and compelling reasons" exist.

Section 3582(c)(1)(A) authorizes district courts to reduce a term of imprisonment if, "after considering the factors set forth in Section 3553(a) to the extent that they are applicable," the court finds that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable policy statement is found in U.S.S.G. § 1B1.13. *United States v. Beck*, 425 F. Supp. 3d 573, 578 (M.D.N.C. 2019). As pertinent here, this policy statement provides that the court may reduce a term of imprisonment, after considering the § 3553(a) factors, if (1) "[e]xtraordinary and compelling reasons warrant the reduction," (2)

"[t]he defendant is not a danger to the safety of any other person or the community," and (3) "[t]he reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

Application Note 1 to § 1B1.13 provides that extraordinary and compelling reasons exist "under any of the [four] circumstances set forth below" in (A) through (D). *Id.* § 1B1.13 application notes 1. Subdivision (A) of Note 1 provides that the medical condition of a prisoner may qualify him for compassionate release, if (i) he is suffering from a terminal illness, or (ii) he is suffering from a serious physical or medical condition that "substantially diminishes" his ability to provide self-care within the prison and he is not expected to recover. *Id.* § 1B1.13 application notes 1(A). Subdivisions (B) and (C) apply to age and family circumstances not invoked here. Subdivision (D) supplies a catchall provision: it applies when "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 application notes 1(D).

Mr. Gray plainly does not qualify under two of the four subdivisions in Note 1. He is not 65 years old (Subdivision (B)), and nothing suggests that the "family circumstances" addressed in Subdivision (C) apply. He also does not qualify under either of the two prongs described in Subdivision (A). Nothing suggests he "is suffering from a terminal illness"—prong (i)—or, as prong (ii) requires, that he has contracted a "serious physical or medical condition" and he "is not expected to recover from" it. § 1B1.13 application notes 1(A).

This leaves Subdivision (D). The guidance in this subsection advises that § 1B1.13 applies when "there exists in the defendant's case an extraordinary and compelling reason other

6

than, or in combination with, the reasons described in subdivisions (A) through (C)" of application note 1.[1] *Id.* § 1B1.13 application notes 1(D).

A few courts have ruled that only the BOP may invoke the catchall provision of subdivision (D). *United States v. Jackson* summarized the reasoning of one such decision:

> Congress gave the Sentencing Commission the mandate to decide what constitutes an extraordinary and compelling reason; the [First Step Act] did not expand the criteria for finding such a reason, but merely allowed defendants to file motions; there can be no relief under this statute without consistency with the policy statement; and the policy statement does not presently provide for a court determination of other reasons.

*United States v. Jackson*, No. 08-20150-02-JWL, 2020 WL 2812764, at *3 (D. Kan. May 29, 2020) (citing *United States v. Lynn*, No. 89-0072-WS, 2019 WL 3805349, at *2–4 (S.D. Ala. Aug. 13, 2019)). But an "overwhelming majority of courts" have rejected this approach. *Id.* They instead have "concluded that a court may make the necessary determination that other circumstances warrant relief under this statute." *Id.* (citations omitted). In other words, "[w]hile the old policy statement provides helpful guidance, it does not constrain the [c]ourt's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." *Beck*, 425 F. Supp. 3d at 579; *see also Jackson*, 2020 WL 2812764, at *3 (assuming, for purposes of deciding the motion, that court is not limited to circumstances set forth in subdivisions (A) through (C)); *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and

---

[1] As explained above, in Section II, § 3582 used to permit the BOP—but not inmates—to file a compassionate release motion. But the First Step Act broadened § 3582(c)(1)(A), so inmates now can file a motion. *See* First Step Act of 2018, Pub. L. No. 115-391, § A 603(b)(1), 132 Stat. 5194, 5239 (2018). The Sentencing Commission hasn't revised § 1B1.13 of the Guidelines since that amendment and so, the language used in this Guidelines provision still requires a motion by BOP. *United States v. Jackson*, No. 08-20150-02-JWL, 2020 WL 2812764, at *3 (D. Kan. May 29, 2020).

compelling reasons exist to modify a sentence—and may do so under the 'catch all' provision . . . ."); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019) (concluding that the correct interpretation of § 3582(c)(1)(A) is that when a defendant brings a motion for a sentence reduction under the amended provision, the court can determine whether extraordinary and compelling reasons—outside those delineated in subdivisions (A)–(C)—warrant granting relief).

The court joins this prevailing view, concluding that it may decide whether "extraordinary and compelling" reasons warrant compassionate release.

### B. Mr. Gray has not established that "extraordinary and compelling reasons" warrant compassionate release.

Mr. Gray seeks compassionate release because (1) he has two medical conditions—hypertension and obesity—that place him at risk of serious illness or death should he contract the COVID-19 virus, (2) he has served 90% of his sentence, and (3) FCI Forrest City Low—where BOP houses Mr. Gray—has had one of the worst COVID-19 outbreaks among BOP facilities. Doc. 124 at 1. Mr. Gray asserts that obesity is an important predictor of severe effects from the COVID-19 virus. *Id.* at 7. Coupled with his severe hypertension—a condition he asserts is the most common comorbidity among those hospitalized for COVID-19—Mr. Gray contends his health is at serious risk should he contract COVID-19. *Id.* at 6–7.

The government asserts that Mr. Gray's hypertension may place him at increased risk of severe illness from the COVID-19 virus but isn't sufficient to warrant compassionate release. Doc. 126 at 6. The government acknowledges, however, that obesity "is a condition that places [Mr. Gray] at increased risk of severe illness from COVID-19." *Id.* at 6. But, the government asserts, Mr. Gray's Body Mass Index ("BMI") of 30 is the "lowest score possible to be placed in the high risk category for COVID-19." *Id.* at 7. In other words, the government asserts, Mr.

8

Gray is obese, but barely so, thus reducing the risk COVID-19 poses to his health. The government also contends that the situation at FCI Forrest City Low has improved "vastly" in recent months. *Id.* The government asserts that as of July 25, 2020, the facility had 29 inmates who were "positive" for COVID-19. *Id.* at 8. This figure represents an improvement, the government asserts, considering 641 inmates in the facility have tested positive for the virus. *Id.*

Mr. Gray responds, asserting that the "improvements" in the infection rates at FCI Forrest City Low simply are a result of the BOP stopping COVID-19 testing of inmates in that facility. Doc. 131 at 3. Indeed, Mr. Gray cites publicly available information from the BOP showing only three pending tests, despite "having a 40% positive rate of past tests[.]" *Id.* And, Mr. Gray, contends, even with limited testing, the numbers recently have increased from 29 to 38 positive cases. *Id.* And, he contends, the government never explains what has changed in FCI Forrest City that reduces the risk of another outbreak at the facility. *Id.* at 4. Mr. Gray also asserts that the government's Response fails to recognize that the combination of Mr. Gray's health conditions—obesity and hypertension—place him at higher risk from the virus than either condition alone.

To be sure, it is regrettable that Mr. Gray is incarcerated during this pandemic. It is also regrettable that his health conditions place him at increased risk of serious illness should he contract the virus. But the court isn't convinced that the combination of those two conditions qualifies him for release. The court reaches this conclusion "after considering the factors set forth in [18 U.S.C.] § 3553(a) to the extent that they are applicable"—the rubric § 3582(c)(1)(A) instructs the court to follow. Four of those statutory sentencing factors are particularly germane here. The next four paragraphs discuss them.

### 1. Nature and Circumstances of the Offense[2]

In December 2011, the Kansas City, Kansas Police Department received a complaint about Mr. Gray selling marijuana. Doc. 60 at 5 (PSR ¶ 19). The complainant reported that Mr. Gray was selling large quantities of high-grade marijuana imported from California. *Id.* Officers arranged a controlled buy from Mr. Gray. *Id.* (PSR ¶ 20). Mr. Gray brought six pounds of marijuana in to the controlled buy and explained to the confidential informant that he recently had returned from a trip out of town and had purchased the marijuana from various dispensaries. *Id.* Officers then followed Mr. Gray to a residence in Kansas City, Kansas. *Id.* at 5–6 (PSR ¶ 21). When Mr. Gray left the residence, officers arrested him. *Id.* They found a handgun, two marijuana cigarettes, and $3,122.89 in cash in his pockets. *Id.* at 6 (PSR ¶ 22).

Officers also executed a search warrant on the residence Mr. Gray had left before officers arrested him. *Id.* (PSR ¶ 24). During the search, officers found several pounds of marijuana, paraphernalia to package and sell marijuana, $515 in cash, and plane ticket stubs under Mr. Gray's name for flights between Kansas City and Los Angeles. *Id.* (PSR ¶¶ 25–26). They also arrested Mr. Gray's girlfriend, Beulah Shepherd, who lived in the home. *Id.* at 6, 7 (PSR ¶¶ 24, 27). Ms. Shepherd reported that the marijuana in the house belonged to Mr. Gray and that Mr. Gray had kept marijuana and large sums of cash in her home. *Id.* at 7 (PSR ¶ 27). This search also revealed that Mr. Gray was renting a storage unit in Kansas City, Kansas. *Id.* (PSR ¶ 28). There, officers found 796.9 grams of marijuana. *Id.*

They also searched Mr. Gray's home. *Id.* (PSR ¶ 29). They found ammunition in the home and documents showing that Mr. Gray received mail at two other addresses in Kansas City, Kansas. *Id.* Officers searched one of the homes—located on Georgia Avenue—where

---

[2]  The facts discussed in parts 1–4 come from the PSR.

10

Johnnie and Lisa Rucker and their infant child lived. *Id.* at 7–8 (PSR ¶ 30). The search revealed a "marijuana cultivating operation" in the basement of the home. *Id.* The deed to this home belonged to Mr. Gray's father.[3] *Id.* at 8 (PSR ¶ 31). Officers also searched the other home—located on Prestwick Drive—where defendant received mail. *Id.* (PSR ¶ 32). This home belonged to Mr. Gray's parents, Pamela and Birnes Penix. *Id.* Officers found a small amount of marijuana in their home. *Id.* Mr. Gray's parents indicated that the marijuana was for their own personal use, that Mr. Gray had not provided it to them, and that they received mail in Mr. Gray's name. *Id.*

In sum, Mr. Gray imported and sold a significant amount of marijuana over the course of two years and pleaded guilty to possession of a firearm in furtherance of a drug-trafficking crime. The nature and circumstances of the offense weighs against release.

### 2. History and Characteristics of the Defendant

This case's convictions were not Mr. Gray's first serious crimes. In 2002, he pleaded guilty to possession of a firearm by a prohibited person and possession with intent to distribute cocaine. *Id.* at 14 (PSR ¶ 62). He received sentences of 24 months' imprisonment, to run concurrently, on each count. *Id.* Mr. Gray acknowledges that he has committed one violent crime but emphasizes that it occurred in 1994 when he was 16 years old. Doc. 124 at 12; Doc. 60 at 13 (PSR ¶ 59). That crime was a robbery where Mr. Gray held up a woman at gunpoint while she sat in her car in a parking lot waiting to pick up her daughter from work. Doc. 60 at 13 (PSR ¶ 59).

---

[3]   The PSR doesn't explain whether Mr. Gray had any involvement in the Ruckers's basement operation or if it merely was coincidental that the Ruckers were cultivating marijuana in a house Mr. Gray's father owned.

Mr. Gray also notes that he while in BOP custody, he has taken advantage of at least 16 programs, including a pre-release class, a life planning skills class, and several financial education classes. Doc. 124 at 13. On the other hand, the government notes that Mr. Gray has lost "good time credit" for various drug and alcohol-related offenses while in BOP custody. Doc. 126 at 10; Doc. 126-3 (Mr. Gray's BOP disciplinary record). Specifically, the government asserts, Mr. Gray has had five drug and alcohol-related infractions since 2017 while in BOP custody. Doc. 126 at 10. Mr. Gray responds, asserting that continued incarceration will not solve his addiction problems. Doc. 131 at 10. Instead, it merely will increase his risk of contracting the virus. *Id.*

While the court commends Mr. Gray's rehabilitation efforts, on balance, his criminal history and BOP disciplinary record weigh against his motion.

### 3. The Need for the Sentence to Reflect the Offense's Seriousness, to Provide Just Punishment, and to Afford Adequate Deterrence to Criminal Conduct

Mr. Gray asserts that he is scheduled for release in September 2021. Doc. 124 at 13. He asserts that he has served about 103 months—nearly 90%—of his custody sentence. *Id.* He also provides some context about his original sentencing and his plea agreement. He explains that he entered a plea agreement with the government recommending 120 months' imprisonment under Rule 11(c)(1)(C) to avoid a "near tripling" of his Guidelines sentence. *Id.* That is, Mr. Gray risked qualifying as a "career offender" because of his Kansas robbery conviction. *Id.*; *see also* Doc. 60 at 23 (PSR ¶ 105) (increasing defendant's criminal history category because he qualified as a "career offender"). A Kansas robbery conviction, however, no longer is a "crime of violence" for purposes of the career offender enhancement, he asserts. Doc. 124 at 13–14; *see also United States v. Nicholas*, 686 F. App'x 570, 574 (10th Cir. 2017) (holding that Kansas

robbery statute is insufficient to satisfy the Armed Career Criminal Act's force requirement). Had Mr. Gray had the benefit of this development in the law, he asserts, he "would have been looking at a [custody] sentence of 21 to 27 months on Count 1 and a five-year consecutive sentence on Count 3." Doc. 131 at 11. Since he already has served 103 months of his custody sentence, he contends that he has served a "sufficient" sentence under this § 3553(a) factor. Doc. 124 at 13–14. And, he contends, a study by the United States Sentencing Commission suggests that releasing Mr. Gray now "does not statistically increase the risk that he engages in new criminal behavior" or violates his conditions on supervised release. *Id.* at 14–16.

The government responds that predicting what plea agreement Mr. Gray would have entered under the present law is speculative. Doc. 126 at 11. And, the government asserts, had Mr. Gray abided by BOP's rules while incarcerated, he likely would have been placed in a residential reentry facility or placed on home confinement months ago. *Id.*

On balance, the court concludes this factor favors Mr. Gray's motion. As it is, Mr. Gray has served almost his entire custody sentence. And while the government is correct it is speculative to predict an agreement that Mr. Gray might have reached had he not faced the "career offender" sentencing enhancement, that label also exposed him to higher sentencing range than he would face if sentenced today.

### 4. The Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant

As explained above, the PSR calculated a Guidelines sentencing range of 262 to 327 months' imprisonment. Doc. 60 at 23 (PSR ¶ 105). This calculation, however, presumed that Mr. Gray qualified as a career offender. *Id.* Because the law since has changed and Mr. Gray would not qualify as a career offender if sentenced under the current law, this calculation no longer is accurate. Mr. Gray's Reply contends that without the career offender enhancement, he

13

would have faced a 21 to 27-month custody sentence on Count 1 and a five-year custody sentence on Count 3—a total of 87 months' imprisonment, at the most. Doc. 131 at 11. The court agrees with Mr. Gray that this factor favors his motion.[4]

### C. Conclusion

Mr. Gray's motion presents a relatively close question. The nature and circumstances of his offense, and his criminal history, weigh against his motion. But the fact that Mr. Gray has served about 90% of his custody sentence—which likely was a higher custody sentence than what Mr. Gray would have faced without the career offender enhancement—favors his motion. The court also recognizes that Mr. Gray's health status—at least in theory—has the potential to increase the severity of the sentence beyond the 120 months already imposed. *United States v. Mel*, No. CR TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("The fact that Mel has been incarcerated . . . during a serious outbreak of COVID-19 inside the facility sufficiently increased the severity of the sentence beyond what was originally anticipated . . . .").

Ultimately, though, the court is not convinced the current conditions in FCI Forrest City Low and Mr. Gray's health conditions warrant the reduction Mr. Gray seeks. Mr. Gray is 42 years old and, generally, in decent health. He also has a significant criminal history and consistently has failed to abide by BOP rules. The court is not prepared to accept that Mr. Gray's health conditions provide sufficient reason for his release under § 3582(c)(1)(A). The court thus denies Mr. Gray's Motion for Compassionate Release (Doc. 119).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Gray's Motion for Compassionate Release (Doc. 119) is denied.

**IT IS SO ORDERED.**

---

[4] The court is mindful of the other factors identified by § 3553(a). They are not pertinent, however, to the current motion.

**Dated this 28th day of August, 2020, at Kansas City, Kansas.**

                                            **s/ Daniel D. Crabtree**
                                            **Daniel D. Crabtree**
                                            **United States District Judge**